FILED
LODGED ___ RECEIVED

DEC 1 9 2012

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

JMG/2010R00059

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIM NO. |
| | ) | |
| v. | ) | (Conspiracy to Commit Wire Fraud |
| | ) | Affecting a Financial Institution, 18 |
| KIMBERLY EILEEN MCMILLIAN, | ) | U.S.C. § 1349; Wire Fraud Affecting a |
| a/k/a Kimberly Simmons, | ) | Financial Institution, 18 U.S.C. § 1343; |
| a/k/a Kimberly Simmons McMillian, | ) | Aiding and Abetting and Causing an Act |
| OLUTOYIN OLADOSU, | ) | to be Done, 18 U.S.C. § 2) |
| a/k/a Tony Oladosu, | ) | |
| and | ) | |
| GLENROY EMMANUEL DAY, SR., | ) | |
| | ) | |
| *Defendants.* | ) | |



### INDICTMENT

The Grand Jury for the District of Maryland charges that:

### COUNT ONE

### (Conspiracy to Commit Wire Fraud
### Affecting a Financial Institution)

### Introduction

At all times relevant to this Indictment:

1.      Defendant **KIMBERLY EILEEN MCMILLIAN, a/k/a Kimberly Simmons, a/k/a Kimberly Simmons McMillian (MCMILLIAN)** was a resident of Baltimore, Maryland.  Defendant **MCMILLIAN** variously worked as, and identified herself as, a real estate agent, real estate consultant, real estate investor, and mortgage loan broker.

2.      Defendant **OLUTOYIN OLADOSU, a/k/a Tony Oladosu (OLADOSU)** was a resident of Prince George's County, Maryland.  **OLADOSU** had established bank accounts in the names of Dee-Ladok Investments, Inc. and Kaycee Associates, Inc.

3.      Defendant **GLENROY EMMANUEL DAY, SR. (DAY)** was a resident of Prince George's County, Maryland.  Although **DAY** was not a licensed real estate appraiser, he sometimes earned money by preparing real estate appraisals that were supposed to be reviewed and approved by a licensed real estate appraiser before they were submitted to lenders in connection with applications for mortgages on residential real estate.

4.      Co-Conspirator # 1 was a resident of Prince George's County, Maryland.

5.      Mr. E.S. was the owner and President of Kenonik Real Estate Investments LLC (Kenonik Real Estate), a company with its principal place of business located at 14426 Fairdale Road in Silver Spring, Maryland that was engaged in the business of purchasing and renovating homes for resale.  In the fall of 2007, Kenonik owned several properties in Baltimore City, including 1204 Clendenin Street, 2413 McCulloh Street, and 2243 Madison Avenue.

6.      Equitable Trust Mortgage Corporation (Equitable Trust) was a company with its principal place of business located in Nottingham, Maryland that was engaged in the business of lending money to home buyers to finance the purchase of residential real estate.  Equitable Trust engaged in interstate commerce by, among other things, receiving loan applications from individuals and mortgage loan brokers and then wiring

the funds for approved loans from offices of its bank located in Pennsylvania and in New

Jersey to the title companies that handled the settlements on each property.

7.      SunTrust Mortgage was a wholly-owned subsidiary of SunTrust Bank,

which was a "financial institution" within the meaning 18 U.S.C. § 20.  It was engaged in

the business of extending home mortgage loans to home buyers and also purchased and

then serviced home mortgage loans that were originated by other lenders, including

Equitable Trust.

8.      BB&T Mortgage was a division of Branch Banking & Trust Company

("BB&T"), which likewise was a "financial institution" within the meaning 18 U.S.C. §

20.  It was engaged in the business of extending home mortgage loans to home buyers

and also purchased and then serviced home mortgage loans that were originated by

other lenders, including Equitable Trust.

### The Conspiracy and the Scheme and Artifice to Defraud

9.      From on or about September 1, 2007 and continuing thereafter until on or

about December 31, 2007, in the District of Maryland, the defendants

**KIMBERLY EILEEN MCMILLIAN,**
**a/k/a Kimberly Simmons,**
**a/k/a Kimberly Simmons McMillian,**
**OLUTOYIN OLADOSU,**
**a/k/a Tony Oladosu,**
**and**
**GLENROY EMMANUEL DAY, SR.,**

together with others known and unknown to the Grand Jury, did knowingly and

willfully combine, conspire, confederate, and agree to commit certain offenses against

the United States, to wit: to devise and intend to devise a scheme and artifice to defraud

Equitable Trust, SunTrust Mortgage, and BB&T of money and property by means of materially false and fraudulent pretenses, representations, and promises, as further described below, and for the purpose of executing the scheme, did cause to be transmitted certain wire communications in interstate and foreign commerce, in violation of Title 18, United States Code, Section 1343.

**The Purpose of the Conspiracy and
the Scheme and Artifice to Defraud**

10.     The purpose of the scheme and artifice to defraud was to enrich defendants **MCMILLIAN** and **OLADOSU** by enabling them to divert to themselves substantial monetary proceeds resulting from the purchase of three homes owned by Kenonik Real Estate and one home owned by **MCMILLIAN** herself in Baltimore City. The purchases of these properties were characterized by the submission of fraudulent mortgage loan applications to Equitable Trust; sales at inflated prices in non-arms-length transactions that far exceeded the actual market values of these properties; misleading, inaccurate, and fraudulent appraisals; the use of personal identifying information from individuals who were not actually involved in the transactions or who had no intention to reside in the properties or to make the mortgage payments; and the provision of the funds necessary to cover the purchaser's down payment and closing costs by **MCMILLIAN** or **OLADOSU**, or from out of the proceeds of the mortgage loan itself.  Defendant **DAY** and Co-Conspirator # 1 aided and abetted the success of the scheme.

## Manner and Means of the Conspiracy
## and the Scheme and Artifice to Defraud

11.     In or about the late summer of 2007, defendant **MCMILLIAN**
approached Mr. E.S., who had recently purchased a number of houses in Baltimore City
as real estate investments.  **MCMILLIAN** advised Mr. E.S. that she had a number of
well-off clients from New York City who were eager to buy residential properties in
Baltimore.  Mr. E.S. subsequently agreed to sell three properties he owned in the
Reservoir Hill neighborhood of Baltimore City (zip code 21217) – 1204 Clendenin Street,
2413 McCulloh Street, and 2243 Madison Avenue – to three of **MCMILLIAN**'s clients,
who were identified to him as Soumaila Sylla, Aboubacar Fofana, and Anthony Johnson.

12.     Defendant **MCMILLIAN** then contacted Mr. R.P., a loan officer with
Equitable Trust.  **MCMILLIAN** advised Mr. R.P. that she was working as a mortgage
loan broker and had several loan application packages for clients who had agreed to
purchase houses in Baltimore City that she wanted to submit to Equitable Trust for
financing.  **MCMILLIAN** told Mr. R.P. that her own company would not be able to get
these loans approved in time to meet the currently scheduled closing dates, and that she
was therefore willing to pass the loan packages along to Equitable Trust to handle in
order to avoid jeopardizing her relationships with her clients.  **MCMILLIAN** further
advised Mr. R.P. that she did not expect to be paid for submitting these loans to
Equitable Trust.  Mr. R.P. agreed to review the loan packages, each of which consisted of
a loan application identifying the purchaser of the house and detailing their employment
history, earnings, assets, and debts, along with supporting documentation such as pay
stubs or vouchers and bank account statements.

13.     After his initial review of the loan application packages submitted by defendant **MCMILLIAN**, Mr. R.P. turned them over to one of Equitable Trust's underwriters for further review and processing.  As part of this process, Equitable Trust sought to verify the employment of the prospective borrowers.  In doing so, Equitable Trust relied upon the information supplied as part of the loan application by **MCMILLIAN**, which included the telephone number for the prospective borrower's employer.

14.     Defendants **MCMILLIAN, OLADOSU**, Co-Conspirator # 1, and at least two other persons known to the members of the Grand Jury either themselves falsely confirmed employment information for the various "purchasers" in response to telephone calls from the underwriter at Equitable Trust, or arranged for others to do so.

15.     Defendant **MCMILLIAN** further arranged for defendant **DAY** to prepare misleading and fraudulent real estate appraisal reports on each of the three properties purchased from Mr. E.S., as well as on the fourth property that was purchased from **MCMILLIAN** herself.  Defendant **DAY** was not himself a licensed appraiser, so he falsely made it appear that a licensed appraiser had reviewed and approved his work.  All four of **DAY's** appraisals were then submitted by **MCMILLIAN** to Equitable Trust in support of the loan applications.

16.     Based upon the information submitted by defendant **MCMILLIAN** as part of the four loan application packages and the false employment verifications, Equitable Trust agreed to extend financing on all four of the requested loans in the following amounts:

| Name of "Purchaser" | Property Address | Amount of Financing Extended |
|---|---|---|
| Soumaila Sylla | 1204 Clendenin Street, Baltimore, MD 21217 | $195,000 |
| Aboubacar Fofana | 2413 McCulloh Street, Baltimore, Maryland 21217 | $299,000 |
| Anthony Johnson | 2243 Madison Avenue, Baltimore, Maryland 21217 | $350,000 |
| Tola Omatayo | 2359 McCulloh Street, Baltimore, MD 21217 | $250,000 |
| TOTAL: | | $1,094,000 |

17.    Virtually all of the material information submitted by defendant

**MCMILLIAN** to Equitable Trust in connection with the loan applications on the

properties listed above was false or fraudulent.  The names and other personal

identifying information of the purchasers and prospective borrowers in each of the loan

applications consisted of either stolen or fictitious identities (in the case of Sylla and

Omatayo) or belonged to immigrants who had returned or shortly planned to return to

their native countries in Africa at the time of these transactions (as was the case with

Fofana and Johnson); in no case was there a real individual with the stated name who

intended to purchase and live in the property and keep up its mortgage payments.  The

representations made on each loan application submitted to Equitable Trust by

defendant **MCMILLIAN** relating to the employment, income, and financial assets for

each purchaser were likewise false, and the supporting documentation she provided on

each prospective borrower, including pay stubs, W-2s, and copies of bank statements,

were also fraudulent.  Finally, the telephone numbers that **MCMILLIAN** provided for

each borrower's employer were actually those of co-

7

conspirators or others who had agreed to falsely verify the borrower's employment when contacted by the underwriter from Equitable Trust.

18.     Once each loan application was approved by Equitable Trust, a settlement date was scheduled on which each loan would go to closing.  A closing is the consummation of a real estate transaction and is handled by a settlement agent, typically an employee of a title company who is licensed by the State of Maryland to conduct real estate settlements or an attorney.  The settlement agent conducts a search of the land records to confirm that the seller of the property has good and marketable title, receives from the lender the funds needed to finance the transaction, and prepares the necessary documents to convey title from the seller to the buyer and to memorialize the transaction.  In this case, the settlements on 1204 Clendenin Street, 2243 Madison Avenue, and 2359 McCulloh Avenue were conducted by Title Company # 1, while that on 2413 McCulloh was conducted by Title Company # 2.

19.     At the closing, the settlement agent receives the buyer's certified check to cover the down payment and their share of the closing costs and presents the closing documents to the parties for their signatures.  Following the settlement, the funds provided by the lender to finance the purchase of the house, together with the funds tendered by the buyer to cover the down payment and the closing costs, are then disbursed by the settlement agent according to the instructions previously received from the seller.  The receipt of these funds and the subsequent disbursements are recorded on the form HUD-1, a federally-mandated settlement statement, which along with the other settlement documents are returned to the lender for its records after the settlement.

20.     Shortly before or on the scheduled date for the closing on each of the four properties, Equitable Trust directed that funds be sent from its lines of credit at Sovereign Bank locations in Pennsylvania and New Jersey by means of interstate wire transfers to either Title Company # 1's or Title Company # 2's accounts at BB&T branches located in Maryland.

21.     The funds to cover the down payment and the buyer's share of the closing costs in connection with the purchase of 1204 Clendenin Street by Soumaila Sylla were provided to defendant **MCMILLIAN** by her co-conspirator **OLADOSU**.  The source of the funds necessary to cover the down payment and closing costs for the purchase of 2413 McCulloh Street by Aboubacar Fofana is not known to the Grand Jury.  On the last two transactions, the purchases of 2243 Madison Avenue and 2359 McCulloh Street, defendant **MCMILLIAN** persuaded the settlement agent to apply funds from the loan proceeds to cover the buyer's down payment and share of the closing costs.

22.     In each of the four transactions, defendant **MCMILLIAN** directed the settlement agents to transfer substantial portions of the loan proceeds to her or to businesses associated with defendant **OLADOSU**, either pursuant to assignment contracts or for the ostensible purpose of paying for renovations carried out on these properties.  In fact, however, no repairs or renovations were carried out on any of the properties by **MCMILLIAN, OLADOSU**, or any businesses or individuals associated with them.

18 U.S.C. § 1349

## COUNT TWO

## (Wire Fraud)

1.      The allegations of paragraphs 1 through 8 and 10 through 22 of Count One are hereby realleged and incorporated herein by reference.

2.      In or about the months of September or October 2007, defendant **MCMILLIAN** tendered a real estate sales contract to Mr. E.S. for his signature.  This contract provided that a buyer named Soumaila Sylla had agreed to purchase the house located at 1204 Clendenin Street in Baltimore City from Mr. E.S.'s business, Kenonik Real Estate Investments, for a price of $195,000.  Mr. E.S. signed the contract and on October 10, 2007 transmitted it back to **MCMILLIAN** or to an independent contractor named Ms. A.F. who worked with **MCMILLIAN** to assemble the loan packages.  This sales contract was subsequently included in the loan application package that **MCMILLIAN** submitted to Equitable Trust for its consideration.

3.      On or about October 10, 2007, defendant **OLADOSU** transmitted by facsimile a copy of a fraudulent Maryland driver's license in the name of Soumaila Sylla to **MCMILLIAN** or to Ms. A.F.  This fraudulent driver's license was subsequently included in the loan package for Sylla that **MCMILLIAN** submitted to Equitable Trust.

4.      On or about October 10, 2007, defendant **MCMILLIAN** caused a loan application to be submitted to Equitable Trust on behalf of Soumaila Sylla requesting a home mortgage loan in the amount of $195,000 in connection with the purchase of 1204 Clendenin Street.  This loan application included false information concerning Sylla's employment (it represented that he was a "Senior Network Engineer" who had worked for a company called "Servicom Technology, Inc." for four years), income (it represented

10

that he earned $8,247 monthly), assets (it represented that he had assets of $60,000 in

an account at Chevy Chase Bank) and current residence (it represented that he resided

at 4129 Garrett Park Road, Silver Spring, Maryland  20906).

     5.     Defendant **MCMILLIAN** further caused the following false documents to

be submitted to Equitable Trust in support of the Soumaila Sylla loan application for

1204 Clendenin Street:

     a.     two fraudulent Chevy Chase Bank checking account statements for

account # xxx-xxx215-1 in the name of Soumaila Sylla, which falsely represented that he

had a balance of $64,902.49 in the checking account as of September 7, 2007, whereas

in fact, although a bank account with that number did exist in the name of Soumaila

Sylla at Chevy Chase Bank, it had a minimal amount ($100) of funds in it at that time;

     b.     fraudulent pay stubs from Servicom Technologies for the pay

periods ending September 15, 2007 and August 31, 2007, which falsely represented that

Sylla had gross pay of $4,123.96 during each of those pay periods, and had earned

$70,107.32 as of September 15, 2007;

     c.     false IRS Form W-2 wage reports for Soumaila Sylla purportedly

issued by Servicom Technology reflecting that he had income of $89,007.54 in 2005 and

$94,262.13 in 2006; and

     d.     an appraisal prepared by defendant **DAY** that fraudulently

appraised 1204 Clendenin Street for $195,000.00.  This house was purchased by Mr.

E.S. in early August 2006 for $40,000.00, and contractors working at his direction

subsequently performed about $30,000 of renovation work on it.  **DAY's** appraisal also

falsely represented that it had been reviewed by Mr. J.G., a licensed appraiser.

6.      On or about October 19, 2007, Ms. B.I., an underwriter for Equitable Trust, placed a call to (301) 497-6081, the number listed on Soumaila Sylla's loan application as that of his employer, Servicom Technology, Inc.  No such company existed in Maryland, although there was a lawn care and snow removal service operating under the name of Servicom LLC.  The telephone number given for Servicom Technology actually belonged to Co-Conspirator # 1.  Co-Conspirator # 1 or another co-conspirator acting on her behalf falsely identified herself as "Lea Johnson," the Human Resources Manager for Servicom Technology, and provided a false verification of employment for Soumaila Sylla.

7.      Based upon these material and false representations, Equitable Trust agreed to extend a home mortgage loan in the amount of $195,000.00 to finance Soumaila Sylla's purchase of 1204 Clendenin Street.  Prior to the closing on October 24, 2007, SunTrust Mortgage, Inc., a wholly-owned subsidiary of SunTrust Bank, agreed to purchase the loan, which it did on November 8, 2007.  SunTrust Mortgage thereby assumed the responsibility for servicing the loan and receiving the mortgage payments tendered by Sylla.  Because the operations of SunTrust Mortgage are financed by SunTrust Bank, any losses sustained by the subsidiary would have an impact on the finances of the parent company.  The closing documents for 1204 Clendenin Street provided notice to the purchaser that SunTrust had bought the loan and would be servicing it.

8.      The loan closed at Title Company # 1 on October 24, 2007.  Soumaila Sylla, the named purchaser, was required to contribute $8,612.00 for the down payment and his share of the closing costs.  These funds were actually provided by defendant

**OLADOSU**, who obtained an official check in this amount using an account he had established at SunTrust Bank in the name of Dee-Ladok Investments.  Defendant **OLADOSU** received the funds necessary to obtain this bank check from another person on October 23, 2007, the day before the settlement.

9.      Defendant **OLADOSU** attended the closing and submitted a handwritten letter to the settlement agent falsely representing that a company of his named Kaycee Associates, Inc. had performed renovations on 1204 Clendenin Street and should be paid $93,267.41 to cover the costs of its work.  In fact, Kaycee Associates had not performed any renovations on 1204 Clendenin Street; the only renovations done on the property since it was acquired by Mr. E.S. in August 2006 were performed by the contractors hired by Mr. E.S.

10.      Defendant **MCMILLAN** further instructed the settlement agent from Title Company # 1 that $30,000 out of the money owed to Kaycee Associates should be paid to her for services she had provided as a contractor.

11.      After the closing, in accordance with the instructions it had received from defendants **MCMILLIAN** and **OLADOSU**, Title Company # 1 issued two checks in the amount of $58,267.41 and $5,000 to Kaycee Associates and one check totaling $30,000.00 to defendant **MCMILLIAN**.  These checks were funded from out of the proceeds of the $195,000 mortgage loan issued by Equitable Trust.  Kenonik Real Estate, the actual owner of 1204 Clendenin, was paid $95,000.00.

12.      As early as December 2007, a letter sent by Title Company # 1 to Sylla at 1204 Clendenin Street was returned by the Postal Service marked "RETURN TO SENDER  ATTEMPTED - NOT KNOWN  UNABLE TO FORWARD."  A few mortgage

13

payments on 1204 Clendenin Street were made to SunTrust Mortgage using money

orders in the months of December 2007 and January 2008, but none were made after

that date. The mortgage then went into default, and SunTrust foreclosed on the

property and sold it for a price of $7,852.65 in May 2010. The ultimate loss suffered by

SunTrust Mortgage on this transaction was $217,968.67, more or less.

      13.    On or about October 24, 2007, in the District of Maryland, the defendants

**KIMBERLY E. MCMILLIAN,**
**a/k/a Kimberly Simmons,**
**a/k/a Kimberly Simmons McMillian,**
**OLUTOYIN OLADOSU,**
**a/k/a Tony Oladosu,**
**and**
**GLENROY EMMANUEL DAY, SR.,**

together with others known and unknown to the members of the Grand Jury, knowingly

and willfully caused to be transmitted in interstate commerce by means of wire

communication certain signs and signals, to wit, a wire transfer in the amount of

$188,609.39, more or less, from the account (# xxxxxx6290) of Equitable Trust at a

branch of Sovereign Bank located in Pennsylvania to the account (# xxxxxx8074) of Title

Company # 1 at a branch of BB&T located in Maryland.

18 U.S.C. § 1343
18 U.S.C. § 2(b)

## COUNTS THREE AND FOUR

### (Wire Fraud)

1.      The allegations of paragraphs 1 through 8 and 10 through 22 of Count One are hereby realleged and incorporated herein by reference.

2.      In the month of October 2007, defendant **MCMILLIAN** tendered a real estate sales contract to Mr. E.S. for his signature.  This contract provided that a buyer named Aboubacar Fofana had agreed to purchase the house located at 2413 McCulloh Street in Baltimore City from Mr. E.S.'s business, Kenonik Real Estate Investments, for a price of approximately $237,000.00, more or less.  Mr. E.S. signed the contract and returned it to **MCMILLIAN**.  **MCMILLIAN** did not submit to this contract to Equitable Trust, however.  Instead, **MCMILLIAN** or another co-conspirator forged Mr. E.S.'s name to a different contract of sale for 2413 McCulloh Street, which listed the sales price as $299,000.  This sales contract with Mr. E.S.'s forged signature was subsequently included in the loan application package that **MCMILLIAN** submitted to Equitable Trust for its consideration.

3.      In or about mid-October, 2007, defendant **MCMILLIAN** caused a loan application to be submitted to Equitable Trust on behalf of Aboubacar Fofana requesting a home mortgage loan in the amount of $299,000 in connection with the purchase of 2413 McCulloh Street.  This loan application included false information concerning Fofana's employment (it represented that he was a "Senior Computer Analyst" who had worked for a company called "First Axis Engineering Services" for ten years), income (it represented that he earned $6,833.55 monthly), and assets (it represented that he had assets of just over $70,000 in two bank accounts at Wachovia

Bank and Bank of America). There was a real person named Aboubacar Fofana who resided at the address shown on the loan application (6735 New Hampshire Avenue, Takoma Park, Maryland 20912), but he actually worked as a driver for Pizza Hut and Papa John's Pizza during the year 2007 with combined earnings from both sources of less than $19,000.00.

      4.     Defendant **MCMILLIAN** further caused the following false documents to be submitted to Equitable Trust in support of the Aboubacar Fofana loan application for 2413 McCulloh Street:

      a.     two fraudulent Bank of America checking account statements for account # xxxx xxxx 2278 in the name of Aboubacar Fofana, which falsely represented that he had a balance of $17,884.63 in the checking account as of September 10, 2007, and a balance of $19,166.35 in his checking account as of October 10, 2007, whereas in fact, there was no account in his name at Bank of America;

      b.     two fraudulent Wachovia Bank checking account statements for account # xxxxxxxxx5263 in the name of Aboubacar Fofana, which falsely represented that he had a balance of $47,211.34 in a checking account as of August 31, 2007, and a balance of $51,216.42 in his checking account there as of September 30, 2007, whereas in fact, Aboubacar Fofana was not an authorized signer on that account number at Wachovia Bank;

      c.     a fraudulent pay stub from First Axis Engineering for the pay period ending October 15, 2007, which falsely represented that Fofana had gross pay of $3,416.67 during that pay period, and had earned $64,916.73 as of October 15, 2007;

    d. false IRS Form W-2 wage reports for Aboubacar Fofana purportedly issued by First Axis Engineering Services reflecting that he had income of $71,115.96 in 2005 and $78,095.43 in 2006; and

    e. an appraisal prepared by defendant **DAY** that fraudulently appraised 1204 Clendenin Street for $301,000.00.  The house had been purchased by Mr. E.S. in early August 2006 for $6,000.00, and he had performed about $120,000.00, more or less, of renovation work on it since its purchase.  **DAY's** appraisal again falsely reflected that it had been reviewed by Mr. J.G., a licensed appraiser.

   5. On or about October 22, 2007, Ms. B.I., an underwriter for Equitable Trust, placed a call to (443) 319-4015, the number listed on Aboubacar Fofana's loan application as that of his employer, First Axis Engineering.  This number actually belonged to Co-Conspirator # 1.  Co-Conspirator # 1 or another co-conspirator acting on her behalf falsely identified herself as "April Good," the Human Resources Manager for First Axis Engineering, and provided a false verification of employment for Aboubacar Fofana.

   6. Based upon these material and false representations, Equitable Trust agreed to extend a home mortgage loan in the amount of $299,000.00 to finance Aboubacar Fofana's purchase of 2413 McCulloh  Street.  Prior to the closing on October 31, 2007, BB&T Mortgage, a division of BB&T, agreed to purchase the loan, which it did effective January 1, 2008.  BB&T Mortgage thereby assumed the responsibility for servicing the loan and receiving the mortgage payments tendered by Fofana.  Any losses sustained by BB&T Mortgage therefore would have an impact on the finances of BB&T.

The closing documents for 2413 McCulloh Street provided notice to the purchaser that BB&T had bought the loan effective January 1, 2008 and would be servicing it after that date.

7.      The loan closed at on October 31, 2007 at Title Company # 2.  Aboubacar Fofana, the named purchaser, was required to contribute $6,000.00 for the down payment and his share of the closing costs.  The source of these funds is unknown to the Grand Jury.

8.      Defendant **MCMILLIAN** further provided documents to the settlement agent indicating that $44,263.64 should be paid to her pursuant to an assignment agreement.

9.      After the closing, in accordance with the instructions it had received, Title Company # 2 issued a check in the amount of $44,263.64 to defendant **MCMILLIAN**, which was funded by the proceeds of the $299,000 loan issued by Equitable Trust. Kenonik Real Estate, the owner of 2413 McCulloh, received a payment of $110,000.

10.     Only a handful of payments were made on the home mortgage loan issued by Equitable Trust and taken over by BB&T for 2413 McCulloh Street.  It soon went into default; the property was foreclosed upon; and BB&T suffered a substantial loss on this transaction.

11.     On or about October 31, 2007, in the District of Maryland, the defendants

**KIMBERLY E. MCMILLIAN,**
**a/k/a Kimberly Simmons,**
**a/k/a Kimberly Simmons McMillian,**
**and**
**GLENROY EMMANUEL DAY, SR.,**

together with others known and unknown to the members of the Grand Jury, knowingly

and willfully caused to be transmitted in interstate commerce by means of wire

communication certain signs and signals, to wit, the wire transfers described below:

| COUNT | DATE | DESCRIPTION OF WIRE TRANSMISSION |
|-------|------|----------------------------------|
| 3 | 10/30/2007 | A wire transfer in the amount of $289,849.47, more or less, from the account (# xxxxxx6290) of Equitable Trust at a branch of Sovereign Bank located in Pennsylvania to the account (# xxxxxx4797) of Title Company # 2 at a branch of BB&T located in Maryland. |
| 4 | 10/31/2007 | A wire transfer in the amount of $44,263.64, more or less, from the account (# xxxxxx4797) of Title Company # 2 at a branch of BB&T located in Maryland through a BB&T wire room in Wilson, North Carolina to the account (# xxxx3201) of Kimberly McMillian at a branch of Wachovia Bank located in Maryland. |

18 U.S.C. § 1343
18 U.S.C. § 2(b)

## COUNTS FIVE AND SIX

### (Wire Fraud)

1.      The allegations of paragraphs 1 through 8 and 10 through 22 of Count One and paragraph 6 of Counts Three and Four are hereby realleged and incorporated herein by reference.

2.      In the latter part of October or the first part of November 2007, defendant **MCMILLIAN** reached an agreement with Mr. E.S. whereby Mr. E.S. agreed to sell a house located at 2243 Madison Avenue in Baltimore City to a buyer named Anthony Johnson for a price of $195,000.  Subsequently, however, **MCMILLIAN** or another co-conspirator forged Mr. E.S.'s name to a contract of sale for 2243 Madison Avenue that listed the sales price as $350,000.  This sales contract with Mr. E.S.'s forged signature was subsequently transmitted by defendant **OLADOSU** or another co-conspirator by facsimile to either **MCMILLIAN** or to Ms. A.F., the independent contractor employed by **MCMILLIAN** to assemble the loan packages.  This sales contract with Mr. E.S.'s forged signature was subsequently included in the loan package for Johnson that **MCMILLIAN** submitted to Equitable Trust.

3.      On or about November 6, 2007, defendant **MCMILLIAN** caused a loan application to be submitted to Equitable Trust on behalf of Anthony Johnson requesting a home mortgage loan in the amount of $350,000 in connection with the purchase of 2243 Madison Avenue.  This loan application included false information concerning Johnson's employment (it represented that he was a "Sales Manager" who had worked for a company called "Ace Imports Inc." for five years),  income (it represented that he earned $7,167 monthly), assets (it represented that he had assets of over $42,000 in an

account at Chevy Chase Bank) and current residence (it represented that he then resided at 6814 Furman Parkway in Riverdale, Maryland, whereas the real Anthony Johnson, a Nigerian national, had briefly resided at that address a year or two previously).

4.      Defendant **MCMILLIAN** further caused the following false documents to be submitted to Equitable Trust in support of the Anthony Johnson loan application for 2243 Madison Avenue:

a.      two fraudulent Chevy Chase Bank checking account statements for account # xxx-xxx640-1 in the name of Anthony Johnson, which represented that he had a balance of $37,322.12 in a checking account there as of September 30, 2007 and a balance of $42,595.04 in his checking account as of October 31, 2007, whereas in fact, although there was a bank account at Chevy Chase Bank in the name of Anthony Johnson, the balance in the account was zero;

b.      a fraudulent pay stub from a car dealership located in Washington, D.C. for the pay period ending November 9, 2007, which falsely represented that Johnson had gross pay of $3,116.39 during that pay period, and had earned $71,676.97 as of November 9, 2007;

c.      an appraisal prepared by defendant **DAY** that fraudulently appraised 2243 Madison Avenue for $358,750. The house was purchased by Mr. E.S. in December 2006 for $145,000.00, and he had not performed any significant renovation work on it since its purchase. **DAY's** appraisal falsely represented that 2243 Madison was "IN GOOD CONDITION AND RECENTLY RENOVATED AND UPGRADED TO CONFORM WITH THE BALTIMORE CITY BUILDING CODE BY UPGRADING THE

ELECTRICAL SERVICE, INSTALLING NEW KITCHEN AND REMOVING THE LEAD

PAINT"; in fact, none of these things was true. **DAY's** appraisal did not mention that

the property had seriously deteriorated floors. It also failed to mention that 2243

Madison had previously been listed for sale for 136 days at an asking price of $200,000

without selling, and did not discuss why the higher appraised value of almost $360,000

was nevertheless justified in spite of this fact. **DAY's** appraisal included interior

photographs showing gleaming hardwood floors and a renovated kitchen and bathroom,

but these photographs were actually from a different property. Finally, **DAY's** appraisal

falsely reflected that it had been reviewed by Mr. J.G., a licensed appraiser.

     5.     On or about November 27, 2007, Ms. B.I., an underwriter for Equitable

Trust, placed a telephone call to (202) 398-5280, the number listed on Anthony

Johnson's loan application as that of his employer, a car dealership located in

Washington, D.C. This number actually did belong to a real car dealership with the

name indicated, but a member of the conspiracy had arranged for the owner of the car

dealership to provide a false employment verification for Johnson. The real Johnson, a

Nigerian national, had never worked for that car dealership, but instead did home

renovation work, and he returned to Nigeria in or about the year 2007.

     6.     Based upon these material and false representations, Equitable Trust

agreed to extend a home mortgage loan in the amount of $350,000.00 to finance

Anthony Johnson's purchase of 2243 Madison Avenue. Prior to the closing on

November 29, 2007, BB&T Mortgage agreed to purchase the loan. BB&T Mortgage

thereby assumed the responsibility for servicing the loan and receiving the mortgage

payments tendered by Johnson. The closing documents for 2243 Madison Avenue

provided notice to the purchaser that BB&T had bought the loan and would begin servicing it effective February 1, 2008.

7.     Prior to the closing at Title Company # 1, Title Company # 1 received an "Assignment Agreement" dated October 30, 2007, which represented that defendant **MCMILLIAN** and another person named Mr. T.G. had previously agreed to purchase 2243 Madison Avenue from Keniok [sic] Real Estate for $195,000.00, but were now prepared to assign their rights to that purchase to an unnamed individual in return for a payment of $140,130.16.  Of this amount, $1,500 was to be paid to Mr. T.G., and the balance to defendant **MCMILLIAN**.  This Assignment Agreement was supplemented by a contract of sale dated November 1, 2007 that purported to sell 2243 Madison from Kenoik [sic] Real Estate to one Muyiwa Harry for $350,000.00, but which was later amended to substitute Anthony Johnson for Muyiwa Harry as the purchaser on November 12, 2007.  Mr. E.S.'s signature on this document was forged.

8.     The loan closed at Title Company # 1 on November 29, 2007.  Anthony Johnson, the named purchaser, was required to contribute $5,703.12 to cover his share of the down payment and his share of the closing costs.  This did not happen.  Defendant **MCMILLIAN**, who was supposed to receive approximately $138,360 pursuant to the "Assignment Agreement," instead advised the settlement agent that she should pay $695.00 of this amount to Ms. A.F. to cover her services in assembling the paperwork for the loan application package, and another $87,000 to Kaycee Associates, the entity owned by defendant **OLADOSU**.  **MCMILLIAN** therefore received a check in the amount of $50,665.45 after closing.  Finally, **MCMILLIAN** instructed the settlement agent to apply $5,703.12 from the amount that was to be paid to Kaycee Associates to

cover the sum that was due to be received from Anthony Johnson as his share of the down payment and closing costs.  This reduced the amount that Title Company # 1 paid to Kaycee Associates following the closing to $81,296.88.

9.      Following the closing on 2243 Madison, the home mortgage loan on that property swiftly went into default.  Foreclosure proceedings have not yet been completed, but BB&T expects to suffer a substantial loss on this loan.

10.      On or about the dates indicated below, in the District of Maryland, the defendants

**KIMBERLY EILEEN MCMILLIAN,**
**a/k/a Kimberly Simmons,**
**a/k/a Kimberly Simmons McMillian,**
**OLUTOYIN OLADOSU,**
**a/k/a Tony Oladosu,**
**and**
**GLENROY EMMANUEL DAY, SR.,**

together with others known and unknown to the members of the Grand Jury, knowingly and willfully caused to be transmitted in interstate commerce by means of wire communication certain signs and signals, to wit:

| COUNT | DATE | DESCRIPTION OF WIRE TRANSMISSION |
|---|---|---|
| 5 | 11/27/2007 | A telephone call from Equitable Trust's offices in Maryland to (202) 398-5280 at a car dealership in Washington, D.C., during which a false employment verification was provided for Anthony Johnson. |
| 6 | 11/29/2007 | A wire transfer in the amount of $341,200.94, more or less, from the account (# xxxxxx6290) of Equitable Trust at a Sovereign Bank branch located in Pennsylvania to the account (# xxxxxx8074) of Title Company # 1 at a branch of BB&T located in Maryland. |

18 U.S.C. § 1343
18 U.S.C. § 2(b)

## COUNTS SEVEN, EIGHT, AND NINE

### (Wire Fraud)

1.      The allegations of paragraphs 1 through 8 and 10 through 22 of Count One and paragraph 6 of Counts Three and Four are hereby realleged and incorporated herein by reference.

2.      In or about the month of February, 2007, defendant **MCMILLIAN** reached an agreement to purchase a house located at 2359 McCulloh Street in Baltimore City from Uptown Realty Company for the price of $75,000.00, although the transaction was not ultimately finalized until December 17, 2007.

3.      On or about December 3, 2007, defendant **OLADOSU** or another co-conspirator acting on his behalf transmitted by facsimile a fraudulent MapComps pay stub for Tola Omatayo, which was subsequently submitted to Equitable Trust in support of a mortgage loan application in the name of Tola Omatayo for 2359 McCulloh Street.

4.      On or about December 4, 2007, defendant **OLADOSU** or another co-conspirator acting on his behalf transmitted by facsimile a fraudulent Chevy Chase Bank statement dated November 30, 2007 for Tola Omatayo, which was subsequently submitted to Equitable Trust in support of his mortgage loan application for 2359 McCulloh Street.

5.      On or about December 6, 2007, defendant **OLADOSU** or another co-conspirator acting on his behalf transmitted by facsimile an "Agreement of Purchase and Sale" dated December 2, 2007, whereby Tola Omatayo agreed to purchase 2359 McCulloh Street from Uptown and/or its assignee, defendant **MCMILLIAN**, for a price

of $250,000.  This sales agreement was submitted to Equitable Trust and included in the loan application file for 2359 McCulloh.

6.      On or about December 11, 2007, a member of the conspiracy transmitted by facsimile a fraudulent Form 1040 U.S. Individual Tax Return in the name of Tola Omatayo for the year 2005, which was subsequently submitted to Equitable Trust in support of his mortgage loan application for 2359 McCulloh Street.

7.      On or about December 5, 2007, defendant **MCMILLIAN** caused a loan application to be submitted to Equitable Trust on behalf of Tola Omatayo requesting a home mortgage loan in the amount of $299,000 in connection with the purchase of 2413 McCulloh Street.  This loan application included false information concerning Omotayo's employment (it represented that he was a "Senior Systems Analyst" who had worked for a company called "MapComps" for over four years), his income (it represented that he earned $7,483 monthly), and his assets (it represented that he had assets of $38,294 in an account at Chevy Chase Bank.

8.      Defendant **MCMILLIAN** further caused the following false documents to be submitted to Equitable Trust in support of the Tola Omatayo loan application for 2359 McCulloh Street:

a.      a fraudulent Chevy Chase Bank checking account statement for account # xxx-xxx013-0 in the name of Tola Omatayo, which falsely represented that he had a balance of $39,760.32 in his checking account there as of November 3, 2007, whereas in fact, this account had a balance at that time of approximately $100;

b.      a fraudulent pay stub from MapComps for the pay period ending November 30, 2007, which falsely represented that Omatayo had gross pay of $3,273.97 during that pay period, and had earned $78,575.28 as of November 30, 2007;

c.      a fraudulent Form 1040 U.S. Individual Tax Return in the name of Tola Omatayo for the year 2005, which falsely reflected that he had earned $79,680 that year; and

d.      an appraisal prepared by defendant **DAY** that fraudulently appraised 2359 McCulloh Street for $253,150.00.  **DAY's** appraisal also falsely reflected that it had been reviewed by Mr. J.G., a licensed appraiser.

9.      On or about December 6, 2007, Ms. B.I., an underwriter for Equitable Trust, placed a call to (301) 681-2055, the number listed on Tola Omatayo's loan application as that of his employer, MapComps.  A member of the conspiracy falsely identified himself as "Samuel Puku," a supervisor for MapComps, and provided a false verification of employment for Tola Omatayo.

10.     Based upon these material and false representations, Equitable Trust agreed to extend a home mortgage loan in the amount of $250,000.00 to finance Tola Omatayo's purchase of 2359 McCulloh  Street.  Prior to the closing on December 17, 2007, BB&T agreed to purchase the loan, which it did effective January 9, 2008.  BB&T thereby assumed the responsibility for servicing the loan and receiving the mortgage payments tendered by Omatayo.  The closing documents for 2359 McCulloh Street provided notice to the purchaser that BB&T had bought the loan and that the borrower's first payment, which was due on February 1, 2008, should be tendered to BB&T.

11.     The loan closed at on December 17, 2007 at Title Company # 1. Tola
Omatayo, the named purchaser, was required to contribute $7,340.25 for the down
payment and his share of the closing costs. No such funds were tendered at the closing,
however. Defendant **MCMILLIAN** instead persuaded the settlement agent to apply
funds that were part of the proceeds of the Equitable Trust loan to cover this amount.

12.     Defendant **MCMILLIAN's** share of the sale proceeds was $153,495.50,
while Uptown Realty received $74,736.35. **MCMILLIAN** provided wiring instructions
to the settlement agent so that she received her share of the sale proceeds by wire. Upon
her receipt of these funds into her account at Wachovia Bank, **MCMILLIAN** then
caused $102,659.75 to be transmitted by wire to an account (# xxxxx6065) of Dee-Ladok
Investments at SunTrust Bank. On the wiring form, **MCMILLIAN** recorded,
"construction paid in full for 2359 McCulloh St Baltimore, MD 21217." In fact, no
construction had been performed by Dee-Ladok Investments on 2359 McCulloh Street.

13.     Following the closing, only a single monthly mortgage payment was made
to BB&T. BB&T subsequently foreclosed on the property and it was sold, resulting in a
substantial loss to BB&T.

14.     On or about the dates indicated below, in the District of Maryland, the

defendants

**KIMBERLY EILEEN MCMILLIAN,**
**a/k/a Kimberly Simmons,**
**a/k/a Kimberly Simmons McMillian,**
**OLUTOYIN OLADOSU,**
**a/k/a Tony Oladosu,**
**and**
**GLENROY EMMANUEL DAY, SR.,**

together with others known and unknown to the members of the Grand Jury, knowingly

and willfully caused to be transmitted in interstate commerce by means of wire

communication certain signs and signals, to wit, the wire transfers described below:

| COUNT | DATE | DESCRIPTION OF WIRE TRANSMISSION |
|-------|------|--------------------------------|
| 7 | 12/17/2007 | A wire transfer in the amount of $242,768.85, more or less, from the account (# xxxxxx6290) of Equitable Trust at a branch of Sovereign Bank located in New Jersey to the account (# xxxxxx8074) of Title Company # 1 at a branch of BB&T located in Maryland. |
| 8 | 12/19/2007 | A wire transfer in the amount of $153,495.50, more or less,  from the account (# xxxxxx8074) of Title Company # 1 at a branch of BB&T located in Maryland to the account (# xxxx3201) of Kimberly McMillian at a branch of Wachovia Bank located in Maryland, which passed through a Federal Reserve Bank processing center located in New Jersey during the course of its transmission. |
| 9 | 12/19/2007 | A wire transfer in the amount of $102,659.75, more or less,  from the account # xxxx3201) of Kimberly McMillian at a branch of Wachovia Bank located in Maryland to the account (# 703636065) of Dee-Ladok Investments at a branch of SunTrust Bank in Maryland, which passed through a Federal Reserve Bank processing center located in New Jersey during the course of its transmission. |

18 U.S.C. § 1343
18 U.S.C. § 2(b)

## FORFEITURE ALLEGATION
## UNDER 18 U.S.C. § 982(a) (2)(A)

### (Conspiracy and Wire Fraud Affecting a Financial Institution)

Upon conviction of conspiracy and one or more of the wire fraud offenses alleged in Counts One  through Nine of this Indictment, defendants **MCMILLIAN, OLADOSU,** and **DAY** shall forfeit to the United States of America pursuant to 18 U.S.C. § 982(a)(2)(A) all right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds obtained directly or indirectly as a result of the scheme to defraud.  The property to be forfeited includes, but is not limited to, the following:

> Money Judgment:
>
> A sum of money, $1.094 million, more or less, which is equal to the total amount of any property, real or personal, which constitutes or is derived from proceeds traceable to the scheme to defraud.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

- cannot be located upon the exercise of due diligence;
- has been transferred, sold to, or deposited with a third party;
- has been placed beyond the jurisdiction of the court;
- has been substantially diminished in value; or
- has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18

U.S.C. § 982(b)(1), to seek forfeiture of any other substitute property of the defendant's

up to the value of the forfeitable property described above.

ROD J. ROSENSTEIN
UNITED STATES ATTORNEY
FOR THE DISTRICT OF MARYLAND

A TRUE BILL:

SIGNATURE REDACTED  SIGNATURE REDACTED

Foreperson

Date:    December  19 , 2012